UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

MICHAEL KOBLENTZ,

          Plaintiff,

    vs.

TWO HARBORS INVESTMENT CORP.,
STEPHEN G. KASNET, WILLIAM
GREENBERG, E. SPENCER ABRAHAM,
JAMES J. BENDER, SANJIV DAS, KAREN
HAMMOND, JAMES A. STERN, and HOPE
B. WOODHOUSE,

          Defendants.

Case No. 26-cv-1281

## COMPLAINT

Plaintiff Michael Koblentz ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## <u>NATURE OF THE ACTION</u>

1.     This is an action brought by Plaintiff against Two Harbors Investment Corp. ("Two Harbors" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Two Harbors, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Two Harbors by UWM Holdings Corporation's

1

("UWMC") wholly controlled subsidiary UWM Acquisitions 1 LLC ("Merger Sub."), an entity formed for the sole purpose of facilitating the present transaction (together with UWMC and Merger Sub., "UWMC").

2.      On or about December 17, 2025, Two Harbors entered into an agreement and plan of merger (the "Merger Agreement"), whereby UWMC will acquire Two Harbors (the "Proposed Transaction") and shareholders of Two Harbors common stock will receive 2.3328 shares of Class A common stock of UWMC for each share of Two Harbors common stock they own (the "Exchange Ratio" or "Merger Consideration").

3.      On or about January 30, 2026, in order to convince Two Harbors shareholders to support the Proposed Transaction, the Board authorized the filing of a Form S-4 Registration Statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). As detailed below, the Registration Statement is materially incomplete and misleading with respect to the financial impacts of the Proposed Transaction on the combined company and the financial fairness of the Proposed Transaction.

4.      The special meeting at which Two Harbors shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") will be scheduled and the Registration Statement that will be used to solicit votes on the Proposed Transaction will be sent to Two Harbors shareholders shortly.  It is imperative that the material information that has been omitted from the Registration Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented and make a fully and fairly informed determination as to how to vote.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction, unless and until the material information

discussed below is disclosed to Two Harbors shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8.     Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District, Two Harbors and UWMC's legal and financial advisors maintain offices in this District, both Two Harbors and UWMC, directly or indirectly, provide mortgage servicing to individuals in this District, and shareholders of Two Harbors reside in this District so Defendants were aware that the Registration Statement would be reviewed in this District. *Santore v. Swaminathan*, No. 17 cv

3

5742, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, No 94 c 1461, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. & Sanitation Emples. Ret. Trust v. Casey*, No. 22-cv-2371, 2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more permissive than under 28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants were aware that the Registration Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## **PARTIES**

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Two Harbors common stock.

10.     Defendant Two Harbors is a publicly traded company incorporated in the state of

Maryland. Two Harbors is a real estate investment trust that invests primarily in mortgage servicing rights and residential mortgage-back securities. Two Harbors' common stock trades on the Nasdaq Stock Market (the "Nasdaq") under the ticker symbol "TWO."

11.     Defendant Stephen G. Kasnet ("Kasnet") is Two Harbors' Chairman of the Board for the Company.

12.     Defendant William Greenberg ("Greenberg") is President and CEO of the Company.

13.     Defendant E. Spencer Abraham ("Abraham") is a director of the Company.

14.     Defendant James J. Bender ("Bender") is a director of the Company.

15.     Defendant Sanjiv Das ("Das") is a director of the Company.

16.     Defendant James A. Stern ("Stern") is a director of the Company.

17.     Defendant Hope B. Woodhouse ("Woodhouse") is a director of the Company.

18.     The defendants identified in paragraphs 11 through 17 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

**A.  Background of the Proposed Transaction**

19.     On December 9, 2024, Greenberg received an unsolicited proposal letter form UWMC proposing to acquire Two Harbors.

20.     On December 26, 2024, Greenberg received an unsolicited proposal letter from a "Company A" to acquire Two Harbors, offering $14.25 to $15.00 in cash for each share of Two Harbor common stock.

21.     On January 13, 2025, the Board met with an undisclosed financial adviser and legal counsel to discuss the proposal letters sent by both UWMC and Company A. The Board determined that Company A's proposal was not sufficient but still determined that negotiations with UWMC

should continue.

22.     On January 15, 2025 the Company notified Company A that the Board determined that Company A's proposal was not in the best interests of the Company.

23.     On January 27, 2025, UWMC submitted a revised non-binding indication of interest increasing its consideration to acquire Two Harbors.

24.     Throughout February 2025, the Board, with assistance from an undisclosed financial advisor, performed strategic alternative analysis and preliminary valuations for a potential combined company. It was about this time as well that the Board first reached out to Houlihan Lokey, Inc. ("Houlihan Lokey") for assistance.

25.     On March 10, 2025, the Board submitted a non-binding term sheet to UWMC which included, among other things, a cash-election merger structure to continue further discussions.

26.     On September 24, 2025, Greenberg received an unsolicited proposal letter from a representative from a "Company B" which contemplated an acquisition of the Two Harbors by Company B in a stock-for-stock transaction at a purchase price of 1.04x fully diluted tangible common book value.

27.     On September 30, 2025, after a conversation between the CEO of Company B and Greenberg, Company B sent a revised letter proposing to acquire Two Harbors in a stock-for-stock transaction at a contemplated purchase price of 1.065x fully diluted tangible common book value.

28.     On October 3, 2025, the Board approved the formation of an ad hoc committee (the "Ad Hoc Committee") to oversee and monitor the process and procedures for the review and evaluation of potential transactions. The Ad Hoc Committee was comprised of Kasnet, Stern, and Woodhouse.

29.     Between October 8, 2025 and October 10, 2025, Houlihan Lokey contacted four

6

parties to gauge their interest in pursuing a strategic transaction with Two Harbors. UWMC and a "Company C" were potential parties that were contacted during this period.

30.    Thereafter, UWMC and Company C's proposals were considered in greater detail. On November 4, 2025, the Ad Hoc Committee, Houlihan Lokey and legal advisors met to discuss the various proposals received from various parties, including UWMC and Company C.

31.    On November 12, 2025, Two Harbors prepared drafts of a potential merger agreement which reflected either an all-cash merger transaction or a stock-for-stock transaction with various conditions discussing termination fees and regulatory approvals.

32.    On November 14, 2025, management representatives from the Company attended a series of diligence calls with representatives from UWMC and Company C. Following these diligence meetings, on November 17, 2025, both UWMC and Company C submitted revised, written non-binding proposals including revisions to the Company's draft merger agreement.

33.    On November 18, 2025, the Ad Hoc Committee met with Houlihan Lokey and legal advisor and determined that a deal with Company C was less certain because of timing considerations and downward valuation adjustments.

34.    On November 29, 2025, Company C submitted a revised draft of the merger agreement to the legal advisor of Two Harbors which included closing conditions and details concerning regulatory approvals.

35.    Subsequently, throughout early December 2025, UWMC and Two Harbors began more substantive diligence efforts and exchanged drafts of the merger agreement and continued discussions regarding purchase price and exclusivity.

36.    On December 12, 2025, the Ad Hoc Committee determined that a deal with UWMC was superior to other options and unanimously approved entry into a limited-term exclusivity

agreement with UWMC.

37.     On December, 17, 2025, Two Harbors and UWMC executed the Merger Agreement

and issued a corresponding joint press release.

**B.      The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement**

38.     On or about December 17, 2025, Two Harbors and UWMC issued a joint press

release to announce the Proposed Transaction, stating in part:

### UWMC Announces Strategic Acquistion of TWO

PONTIAC, Mich. & NEW YORK--(BUSINESS WIRE)-- UWM Holdings Corporation ("UWMC") (NYSE: UWMC), the publicly traded indirect parent of United Wholesale Mortgage ("UWM"), the #1 overall mortgage lender in America, and Two Harbors Investment Corp. ("TWO") (NYSE: TWO), an MSR-focused REIT and one of the largest servicers of conventional mortgages in the country through its wholly-owned subsidiary RoundPoint Mortgage Servicing LLC ("RoundPoint"), today announced that they have entered into a definitive merger agreement pursuant to which UWM will acquire TWO in an all-stock transaction for $1.3 billion in equity value, based on a fixed exchange ratio of 2.3328x.

This is a forward-looking strategic move that strengthens UWM's long-term vision and is expected to unlock substantial opportunities for increased profitability and cash flow, a stronger balance sheet, streamlined operations and elevated client success. The transaction represents a powerful alignment of two highly-complementary organizations — positioning the combined company for accelerated growth and enhanced outcomes for UWM, brokers, consumers and stockholders.

This transaction is expected to provide UWM with (i) expanded servicing expertise and scale as it continues to expeditiously bring servicing in-house, (ii) a high-quality $176 billion UPB MSR portfolio, nearly doubling its existing MSR portfolio to approximately $400 billion, which will create significant recurring revenues, and (iii) the opportunity for approximately $150 million of cost and revenue synergies on an annual basis to help drive meaningful earnings accretion. UWM's strong pro forma cash flow coupled with a strengthened balance sheet is expected to allow UWM to continue investing in growth while also rewarding stockholders at both companies with continued dividends. The combined company will also be able to leverage TWO's proven capital markets expertise and UWM's scale to create further efficiencies around financing, hedging and secondary markets.

**Terms of the Transaction**

Under the terms of the agreement, TWO stockholders will receive a fixed exchange ratio of 2.3328 shares of UWMC Class A Common Stock for each share of TWO common stock. This represents an $11.94 per share value based on UWMC's closing price as of December 16, 2025, and a premium of 21% the volume weighted average price (VWAP) of TWO's common stock for the 30 days ending December 16, 2025. Upon completion of the transaction, UWM shareholders will own approximately 87% of the combined company on a pro forma fully diluted basis, while TWO shareholders will own approximately 13%. The all-stock transaction is intended to be tax-free to TWO's stockholders. The Board of the combined company is expected to expand to eleven directors through the addition of one additional director designated by TWO.

**Advisors**

BofA Securities and Greenhill, a Mizuho affiliate, are acting as financial advisors to UWMC. Greenberg Traurig, P.A. is acting as legal counsel to UWMC. Houlihan Lokey is acting as financial advisor and Jones Day is acting as legal counsel to TWO.

39.     On or about January 30, 2026, in order to solicit approval to consummate the Proposed Transaction from Two Harbors' public shareholders, the Board authorized the filing of the Registration Statement with the SEC.

40.     The Registration Statement is materially incomplete and misleading.

**C.     The Preclusive Deal Protection Devices**

41.     The Merger Agreement contains onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

42.     The Merger Agreement provides for a termination fee payable to Parent by the Company in the amount of $25,400,000 in the event the transaction is not consummated.

43.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

**D.    The Materially Incomplete and Misleading Registration Statement**

44.     The Registration Statement is materially incomplete and misleading with respect to (i) whether various option exercises and Rule 10b5-1 sales conducted by Company executives played a role in the timing of the execution of the Merger Agreement and the announcement of the Proposed Transaction; (ii) the identity of the unnamed financial advisor used by the Company in December 2024 and early 2025 and what fees, if any, were paid to such unnamed financial advisor above and in addition to the transaction and other fees to be paid to Houlihan Lokey; (iii) what financial advisory services Houlihan Lokey undertook warranting approximately $2.5 million in fees in the two years preceding the issuance the fairness opinion; and (iv) the failure of Houlihan Lokey's to disclose certain projections and implied valuations for the Company and UWMC in its analysis of the fairness of the Proposed Transaction.

**i.    The Registration Statement is Materially Incomplete and Misleading as to Rule 10b5-1 Sales conducted by Company executives**

45.     The Registration Statement does not disclose what role if any the Company's 10b5-1 plan played in the timing of the execution of the Merger Agreement and the announcement of the Proposed Transaction.

46.     On December 17, 2025, the day of the announcement of the Proposed Transaction, and the following day, December 18, 2025, Defendant Greenberg along with four other Company senior executive officers exercised options and made non-open market purchases as follows:

| Insider | Relation | Last Date | Transaction | Owner Type | Shares Traded | Price | Shares Held |
|---|---|---|---|---|---|---|---|
| SANDBERG REBECCA B | Officer | 12/19/2025 | Automatic Sell | Direct | 27,370 | $11.43 | 156,718 |
| GREENBERG WILLIAM ROSS | Officer | 12/18/2025 | Acquisition (Non Open Market) | Direct | 309,187 | $0.00 | 804,592 |
| GREENBERG WILLIAM ROSS | Officer | 12/17/2025 | Acquisition (Non Open Market) | Direct | 103,948 | $0.00 | 495,405 |
| HANSON ALECIA | Officer | 12/17/2025 | Acquisition (Non Open Market) | Direct | 12,342 | $0.00 | 56,056 |
| LETICA NICHOLAS | Officer | 12/17/2025 | Acquisition (Non Open Market) | Direct | 61,714 | $0.00 | 221,995 |
| RUSH ROBERT | Officer | 12/17/2025 | Acquisition (Non Open Market) | Direct | 34,714 | $0.00 | 121,801 |
| SANDBERG REBECCA B | Officer | 12/17/2025 | Acquisition (Non Open Market) | Direct | 37,285 | $0.00 | 184,088 |

47. On December 19, 2025, just two days after the announcement of the Proposed Transaction, Defendant Greenberg and these same executive officers sold shares pursuant to the Company's 10b5-1 plan as follows:

| Insider | Relation | Last Date | Transaction | Owner Type | Shares Traded | Price | Shares Held |
|---|---|---|---|---|---|---|---|
| HANSON ALECIA | Officer | 1/07/2026 | Acquisition (Non Open Market) | Direct | 32,679 | $0.00 | 77,967 |
| LETICA NICHOLAS | Officer | 1/07/2026 | Acquisition (Non Open Market) | Direct | 151,727 | $0.00 | 318,234 |
| RUSH ROBERT | Officer | 1/07/2026 | Acquisition (Non Open Market) | Direct | 44,351 | $0.00 | 142,558 |
| SANDBERG REBECCA B | Officer | 1/07/2026 | Acquisition (Non Open Market) | Direct | 81,699 | $0.00 | 238,417 |
| GREENBERG WILLIAM ROSS | Officer | 12/30/2025 | Disposition (Non Open Market) | Direct | 154,593 | $11.32 | 546,106 |
| DELLAL WILLIAM | Officer | 12/22/2025 | Automatic Sell | Direct | 7,087 | $11.44 | 36,703 |
| GREENBERG WILLIAM ROSS | Officer | 12/19/2025 | Automatic Sell | Direct | 103,893 | $11.42 | 700,699 |
| HANSON ALECIA | Officer | 12/19/2025 | Automatic Sell | Direct | 10,768 | $11.41 | 45,288 |
| LETICA NICHOLAS | Officer | 12/19/2025 | Automatic Sell | Direct | 55,488 | $11.42 | 166,507 |
| RUSH ROBERT | Officer | 12/19/2025 | Automatic Sell | Direct | 23,594 | $11.43 | 98,207 |

48. Given that Company insiders, including Defendant Greenberg, exercised options and sold shares pursuant to the Company's Rule 10b5-1 plan only two days after the announcement of the Proposed Transaction on December 17, 2025, it is possible that the timing of both the execution of the Merger Agreement and the announcement of the Proposed Transaction may have been influenced by Defendant Greenberg and other executives' desire to maximize their profits.

49. As such, a reasonable stockholder is entitled to know whether Greenberg or the Board took into consideration the Company's Rule 10b5-1 plans in determining the timing of the execution of the Merger Agreement and the public announcement of the Proposed Transaction.

ii. **The Registration Statement is Materially Incomplete and Misleading as to Houlihan Lokey's fee award in connection to advisory services provided to Two Harbor**

50. The Registration Statement does not disclose potentially material conflicts of interest Houlihan Lokey may have had in rendering its fairness opinion. Item 1015(b) of 17 C.F.R. § 229.1015(b)(4) requires a financial advisor to "Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; (ii) The subject company or its affiliates."

51. The Registration Statement fails to disclose all of Houlihan Lokey's material relationships in connection to advisory services performed for Two Harbors, only stating in relevant part:

> Houlihan Lokey and certain of its affiliates have in the past provided, and are currently providing, investment banking, financial advisory and/or other financial or consulting services to Two Harbors, for which Houlihan Lokey and its affiliates have received, and expect to receive, compensation, including, among other things, ***during the two years prior to the date of its opinion, having provided certain financial advisory services to Two Harbors in connection with its review of strategic alternatives and consideration of strategic transactions, for which Houlihan Lokey and its affiliates have received aggregate compensation of approximately $2,500,000***.

Registration Statement at 57 (emphasis added).

52. The Registration Statement does not disclose the services Houlihan Lokey performed to warrant this $2.5 million dollar fee, which were separate from the transaction and other fees Houlihan Lokey has and will receive in connection with its services and fairness opinion with respect to the Proposed Transaction.

53.     Houlihan Lokey's past services are especially concerning because Houlihan Lokey does not appear to be the original or first financial advisor Two Harbor used in its initial negotiations with UWMC, which commenced in December 2024.

54.     Indeed, after receiving a proposal to acquire Two Harbors from UWMC on December 18, 2024, the Registration Statement only states that the Company consulted with an undisclosed "financial advisor" when considering the proposal and future communications from UWMC:

> Representatives of Two Harbors' ***financial advisor*** discussed, among other things, the terms of each proposal, market and trading perspectives on each of the proposals and other potential strategic alternatives to the proposals, including pursuing a growth strategy as an independent company and terminating Two Harbors' status as a real estate investment trust and compared those alternatives to the transaction proposals.

Registration Statement at 36-37 (emphasis added).

55.     Two Harbors did not engage Houlihan Lokey until February 23, 2025, several weeks after deliberation and communication with UWMC in which the undisclosed "financial advisor" played a significant role:

> On February 23, 2025, Two Harbors engaged Houlihan Lokey as an additional financial advisor to perform a strategic alternatives analysis, which included a review of Two Harbors' corporate strategic posture and the identification and evaluation of certain strategic alternatives available to Two Harbors.

Registration Statement at 37.

56.     Because Houlihan Lokey provided advisory services in relation to "strategic alternatives" and "strategic transactions" two years preceding the date of rendering their fairness opinion (i.e., December 17, 2025), the Registration Statement should disclose whatever financial advisory services Houlihan Lokey provided from December 2023, roughly a full year before UWMC made contact with Two Harbors in December 2024.

57. Without details or context concerning Houlihan Lokey's advisory services from December 2023, a reasonable stockholder cannot properly assess the independence and validity of Houlihan Lokey's fairness opinion as it is completely unknown whether prior services and related fees influenced or had any relation to Houlihan Lokey's financial analysis. Further, it is unknown why Two Harbor's undisclosed "financial advisor," which was involved in providing financial advisory services from at least December 2024 until at least February 2025, was replaced by Houlihan Lokey.

58. Additionally, the Registration Statement does not disclose what fees Two Harbors' unnamed "financial advisor" may have received for providing financial advisory services from at least December 2024 until at least February 2025. Such information is also material in determining whether substantial Company resources were expended for financial services that were ultimately superseded by Houlihan Lokey.

iii. **The Registration Statement is Materially Incomplete and Misleading as to the Valuations and Projections used by Houlihan Lokey in their Financial Fairness Opinion**

59. The Registration Statement fails to disclose key details regarding certain financial projections for both Two Harbors and UWMC, which were used by Houlihan Lokey in its fairness opinion.

60. The Registration Statement states that Houlihan Lokey's fairness analysis utilized fair value ratios. These fair value ratios appear to have been be calculated, in part, based on assumptions about Two Harbors' Tangible Book Value per share ("TBVS") multiples and the implied values for UWMC:

| | Transaction Value/ Tangible Book Value |
|---|---|
| High | 1.16x |
| Mean | 0.96x |
| Median | 0.97x |
| Low | 0.74x |

Taking into account the results of the selected transactions analysis of Two Harbors, Houlihan Lokey applied a selected multiple range of 0.95x to 1.15x to Two Harbors' tangible book value per share as of September 30, 2025. The selected transactions analysis of Two Harbors and the selected companies analyses of UWMC indicated an implied Exchange Ratio reference range of 1.49 to 2.34 shares of UWMC Common Stock for each share of TWO Common Stock, as compared to the Exchange Ratio of 2.3328 shares of UWMC Common Stock for each share of TWO Common Stock provided for in the Merger pursuant to the Merger Agreement.

Registration Statement at 56.

61.     However, the Registration Statement does not appear to disclose the Two Harbors TBVS projections or the UWMC implied values that Houlihan Lokey used in its financial analysis in reporting its fair value exchange ratios. The projections and implied values need to be disclosed so that stockholders can assess whether the fair value exchange ratios used by Houlihan Lokey in its fairness opinion were reasonable and valid.

62.     Further, the Registration Statement suggests that Two Harbors' projections were based on the Company's Common Book Value per share ("CBVS"):

*Summary of Two Harbors Projections*

Subject to the foregoing qualifications, the following table presents a summary of the Two Harbors Projections, based on information and assumptions that include, among others, assumptions related to Two Harbors' portfolio composition (including investments in securities and MSR, and respective financing balances), performance, investment strategy and target leverage ratios, contractual obligations, prevailing and projected interest rates, operating expenses, the mortgage loan market and mortgage spreads, origination and servicing volumes, home prices, U.S. residential real estate market conditions, macroeconomic conditions, asset availability and regulatory risks.

| | 2025E | 2026E | 2027E | 2028E | 2029E |
|---|---|---|---|---|---|
| Operating Income(1) / Basic Common Share | $ 1.28 | $ 1.34 | $ 1.38 | $ 1.39 | $ 1.39 |
| Common Dividends / Basic Share | $ 1.53 | $ 1.37 | $ 1.37 | $ 1.37 | $ 1.37 |
| Common Book Value / Basic Share | $10.99 | $10.95 | $10.95 | $10.96 | $10.98 |

Registration Statement at 59.

63.     However, the Registration Statement fails to disclose that intangible assets or liabilities were excluded from these projections. This appears to be the case because these

15

intangible assets or liabilities are excluded in the Company's pro forma balance sheet adjustment notes in its unaudited pro forma condensed combined financial information. This financial information states that Two Harbors included $27.5 million in historical. *See* Registration Statement at 138.

64.     Such goodwill value represents an intangible asset that is clearly material in evaluating and assessing the value and difference between the TBVS and CBVS. Without knowing how the TBVS projection was calculated, a reasonable stockholder cannot evaluate the reasonableness of the value of the TBVS or CBVS projections. Assuming roughly 100 million shares of Two Harbors outstanding, the $27.5 million in historical goodwill would represent roughly a $0.25 per share difference between the TBVS and the CBVS values.

65.     Additionally, the Registration Statement states that UWMC's implied valuations were based on a 10x to 13x multiple to 2028 earnings per share ("EPS"):

> *Discounted Cash Flow Analysis.* Houlihan Lokey performed a discounted cash flow analysis of Two Harbors and UWMC based on the Two Harbors Projections and the UWMC Projections, respectively. With respect to Two Harbors,

> Houlihan Lokey applied a range of terminal value multiples of 0.75x to 1.10x to Two Harbors' estimated 2029E tangible book value per share as and discount rates ranging from 10.5% to 12.5%. With respect to UWMC, Houlihan Lokey applied a range of terminal value multiples of 10.0x to 13.0x to UWMC's estimated 2028E earnings per share and discount rates ranging from 10.5% to 12.5%. The discounted cash flow analysis indicated an implied Exchange Ratio reference range of 1.12 to 1.92 shares of UWMC Common Stock for each share of TWO Common Stock, as compared to the Exchange Ratio of 2.3328 shares of UWMC Common Stock for each share of TWO Common Stock provided for in the Merger pursuant to the Merger Agreement.

Registration Statement at 56-57.

66.     The 2028 EPS projection, however, does not disclose the projections used in calculating these multiples. The Registration Statement only includes the "pre-tax income," i.e., calculated after the financial adviser considered interest and depreciation and amortization without providing the underlying analysis of the 2028 EPS projections that had likely already been

calculated. The 2028 EPS projections should be disclosed so that stockholders can assess the reasonableness of the multiples used to calculate UWMC's implied valuations.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

67.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

68.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

69.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

70.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

71.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

72.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

73.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.   The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.   Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

74.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

75.     The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

76.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

77.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

79.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

81.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

82.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

84.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 4, 2026                          **ADEMI LLP**

By:   */s/ John D. Blythin*
Guri Ademi (WI 1021729)
John D. Blythin (IL 6281648)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*